## Commonwealth *v.* Diori, Appellant (No. 1).

*Liquor laws—Selling liquor without a license.*

Where a padrone furnishes laborers to a railroad contractor at a stipulated wage or price, and conducts a commissary department for furnishing supplies to such laborers, and in the course of the business of furnishing food and supplies, takes orders for beer from the laborers, sends the orders to a brewer, accompanied by his own check for the price, receives the beer at the commissary, bottling it from kegs, and furnishes the beer to the laborers by punching supply checks held by the laborers in proportion to the price paid and quantity of beer ordered, he may be convicted by a jury of selling liquor without a license.

Argued Nov. 20, 1912. Appeal, No. 240, Oct. T., 1912, by defendant, from judgment of Q. S. Wyoming Co., October Sessions, 1912, No. 28½, on verdict of guilty in case of Commonwealth v. Sam Diori. Before Rice, P. J., Henderson, Morrison, Orlady, Head and Porter, JJ. Affirmed.

Indictment for selling liquor without a license. Before Terry, P. J.

The facts are stated in the opinion of the Superior Court.

Verdict of guilty, upon which judgment of sentence was passed. Defendant appealed.

*Errors assigned* were various instructions.

*Joseph Wood Piatt,* for appellant.

*O. Smith Kinner,* district attorney, with him *Asa S. Keeler,* for appellee.

OPINION BY ORLADY, J., April 21, 1913:

These three defendants were severally prosecuted and convicted for selling liquor on Sunday, and by agreement of counsel they were tried together, separate appeals being taken, they have been heard together in this court. The uncontradicted evidence in the case shows that one Flickwire was a contractor of the Lackawanna Railroad, involving extensive contract work in Wyoming county. The Diori Brothers were padrones who furnished men for the contractor under a stipulated wage or price, and also conducted a commissary department to supply groceries, meat, etc., to the employees they furnished. About 260 foreigners were furnished by the Diori Brothers, and these were housed in shanties or shacks which had been erected by the contractor and rented to the men. All general food supplies were furnished through the commissary station established by the Diori Brothers. The system or arrangement of furnishing beer is described as follows: "We are supposed to furnish the men and keep them and supply their goods. When they want beer they have no place to keep it in their shanties, they give us an order and we sent it in to the Standard Brewing Company. The beer is shipped to them and we hand it out to them. We use a check system so as to keep count of how much each person has so that he don't get more than is due him. When the order is given they pay for it and we send a check along with the orders to the brewery. They pay the Brewing Co. We simply act as agents for them. The beer is shipped in kegs or crates or cases. That that comes in kegs we bottle for the men. They do not pay us any money when they get the beer, but we have a system of checks or tickets which are punched to show just what each man gets. Each one has a check or ticket which they get when they give the order, and every time they take a bottle it is punched out, and when the ticket is finished, the case or whatever they get is finished and they get no more until they give another order, and then they get another ticket. If a man gets a bottle, a five cent check is

punched; two bottles would be ten cents.   The bottles come from the Standard Brewing Company, which furnishes the bottles and the keg.   Anything can be bought on these tickets, but when he gets beer there is a different punch mark.   The beer comes in barrels, $\frac{1}{2}$, $\frac{1}{4}$ and $\frac{1}{6}$ barrel.   The kegs are $\frac{1}{2}$ barrels.   You get from 60 to 72 bottles out of a keg.   When a man buys a keg of 60 bottles he may get it, or anybody can get it on a check. Sometimes three or four of them go together and one man orders it and they all drink for what they can get on their checks.   When the beer comes to the commissary department it is marked with the man's name that orders it, we hold it for the man and he takes what he wants of it. It is an accommodation we have for the men.   The check system keeps the account of how much each fellow gets. We furnish the men and receive so much from them; our profit is from groceries sold to them.   The checks mentioned are of different grades represented by color, red, blue and green.   The beer was delivered at a counter or bar in the commissary where the groceries are kept."

It admitted that the substance handled was lager beer, and that the defendants had no license authorizing them to sell it.   Their contention being that they simply held for safe keeping the malt or brewed liquors which was ordered by the laborors individually from a brewing company, and shipped to and received by the defendants and then passed out to the laborors from time to time under the card system to prevent dispute, and that the defendants had no personal interest in the liquor and received no remuneration for handling it.   On the trial the jury was instructed "We leave it to you to say whether under the testimony, were the charges in these indictments proven.   If you believe that the defendants simply delivered the beer to individuals, which came to those individuals in their name and that the beer was paid for by the individual when they ordered the beer by sending the money to the brewer; if you believe the contention of the defendants here, that that was the method by which

this beer was furnished to the men and that it was not the beer of the defendants or their employers, and that they did not sell, trade or barter, if you believe that, you should acquit these defendants. If on the other hand you say that they did sell this malt liquor and that this system of checks or tickets and delivery of the beer is simply set up here as an evasion of the law, as a way to get around the law and if you say that they sold the liquor as claimed and alleged by the counsel, and if you are satisfied of that beyond a reasonable doubt, then you should convict."

The assignments of error relate to an excerpt taken from the charge of the court, and to a colloquy between the court and a witness who was a sales agent and director of the brewing company, in regard to their right to make sales of beer by wagon load lots in Wyoming county that was manufactured in Lackawanna county; we fail to see how this prejudiced the defendants in any manner; it did not relate to any act affecting them, and their defense was clearly defined and fully explained by court and counsel, so that it narrowed down to a single question of whether or not this transaction was one in good faith, or whether it was simply a subterfuge and device conceived and executed by these defendants for the express purpose of evading our liquor laws. As said by Chief Justice PAX-SON in Com. v. Holstine, 132 Pa. 357: With reference to the Act of May 13, 1887, P. L. 108, the devices to evade it are so numerous and so adroit, and the consequences of its violation are so serious to the welfare and good order of the community generally, that we think it the duty of the courts to enforce the law rigidly. It is needed that all those who engage in this traffic in violation of law should know that the way of the transgressor is hard."

In many respects the case resembles Com. v. Hecir-rionic, 39 Pa. Superior Ct. 510, and under the admitted facts in this case it would be against the common judgment of mankind to hold that these defendants were not interested in these sales of lager beer. They received the

order for the beer; transmitted their own money by check to the brewer, and the subject-matter of the price was delivered to the commissary under their control, where it was bottled and distributed to the holder of the checks in proportion to the price paid and quantity ordered. It could not be held to be anything else than a clumsy and ineffective scheme to sell beer along with the other supplies to the laborors they furnished.    In this class of cases as in all others the evidence, and that alone, must convince the jury beyond a reasonable doubt that every element of a complete violation of the law exists in the case, before there can be a conviction, but the evidence in this case is so free from contradiction and the inference so palpably clear that the jury were well warranted in concluding that the defendants were guilty.

The assignments of error are overruled, the judgment is affirmed, and it is ordered that the defendants appear in the court below at such time as they may be there called and be by that court committed until each has complied with that part of the sentence which had not been performed at the time this appeal was made a supersedeas.